Argued March 14, affirmed April 17, argued on rehearing July 10, former opinion adhered to November 27, 1928.

## PEARL NICKSON v. OREGON–AMERICAN LUMBER CO. ET AL.

(266 Pac. 254; 271 Pac. 986.)

For appellants there was a brief over the name of *Messrs. Wilson & Reilly,* with an oral argument by *Mr. James G. Wilson.*

For respondent there was a brief over the name of *Messrs. Senn & Recken,* with an oral argument by *Mr. F. S. Senn.*

McBRIDE J.—The testimony in this case covers a great deal of ground, but the salient facts may be stated as follows:

Keasey is a railroad station on what is generally designated in the testimony as the S. P. & S. railroad, which extends from that place to the town of Linnton in Multnomah County. The O. A. L. Company have constructed a logging road from Keasey in a southwesterly direction some six or seven miles to their logging camp. This road is extended by the Inman-Poulsen Lumber Company for a distance of something over a mile to what is called their "headquarters camp," and from this camp the road extends farther about one and three quarters of a mile to the principal scene of their logging operations where their actual operators seem to reside while in the service of the company.

The husband of this plaintiff, at the time of the accident in question and for a long time prior thereto, had been employed as a laborer of the logging camp of the Inman-Poulsen Lumber Company and the plaintiff, his wife, was employed there for about six months up to about three weeks before the accident occurred, when she ceased to be employed and was engaged in preparations for housekeeping in a shack where she and her husband proposed to reside, he continuing in the employ of the company.

The tracks of the two companies, O. A. L. Company and the Inman-Poulsen Lumber Company, seem to have been used jointly by them in their logging operations, each one having the right to use the

track of the other, but in a way not to interfere with each other's operations. There is no proof of any formal contract between them to this effect, but the evidence abundantly shows that each party assumed to have a right to use the tracks of the other in their necessary operations; that each party exercised the right to use, in addition to logging trains, railway speeders to and from the station at Keasey through the whole extension of the two railway systems, and that the title to the railroad from the camp of the O. A. L. Company to Keasey was in the O. A. L. Company and the title to the extension of the railroad and other camps of the Inman-Poulsen Lumber Company was in that company. It appears from the uncontradicted testimony that there was no other way for employees or other persons visiting in the O. A. L. Company's camp or the Inman-Poulsen Company's camp to get to them or away from them except by riding upon logging trains or speeders along the respective tracks. There is abundant evidence that it was a common practice of both companies to use these speeders and to carry, without charge, persons desiring to visit either of said camps, or to depart therefrom. To avoid the interference of such speeders with each other, or with the logging trains upon the railroad, it seems to have been customary for the person operating the speeder to stop at the camps of the O. A. L. Company and get a clearance from the operator there who was in the employ of the O. A. L. Company before proceeding on the journey to Keasey. In this way a speeder proceeding from the O. A. L. Company's camp could have reasonable assurance that it would not meet with any train or speeder coming from the opposite direction. On the day of the accident the plaintiff

desired to go to Portland to visit and take care of her mother, who was sick, and boarded a speeder of the Inman-Poulsen Company for that purpose. Whether she boarded the speeder by permission, or by invitation, or was simply taken as a passenger by reason of what appears to have almost if not entirely been a custom of the companies, does not appear. She boarded the speeder of the Inman-Poulsen Company which had attached to it a trailer containing several employees of the said company, and it proceeded to the camp of the O. A. L. Company where the person in charge of that camp gave them a clearance with the information that an O. A. L. Company's speeder was also proceeding to Keasey and was about fifteen minutes ahead of them. The O. A. L. Company's speeder was in charge of the defendant Davidson, who was going to Keasey on business for the company, one of the particulars of which was to pick up some six-foot iron rails for the purpose of putting them together or using them at Keasey as a turntable for the machine which he was in charge of. What other business he had there, if any, does not appear.

The turntable material was located about half-way between the O. A. L. Company's camp and Keasey, and at a point about six or seven hundred feet above the scene of the accident. On his way down Davidson had passed the place where the turntable material was lying and becoming aware of this fact he started to back up the grade toward the O. A. L. Company's camp, and while so doing sighted the Inman-Poulsen Lumber Company's speeder on which plaintiff was riding and stopped his car, the Inman-Poulsen Company's driver doing likewise, the interval between the two cars being

variously estimated at from 30 to 50 feet. At this time there was on the Inman-Poulsen Lumber Company's car the plaintiff and her daughter, a man by the name of Gillies, another man by the name of Peterson, and the driver, and in the trailer attached to it were several other persons to the number of seven or eight. Davidson got out of his car and told the defendant Domnisse to watch it, went back to the Inman-Poulsen Lumber Company's car and explained to a man by the name of Winkler, who was in charge of that car, that he had passed the rails he was looking for and requested Winkler to back the speeder up and assist him in finding them, and bring them down to his own car. Winkler complied with this direction and the Inman-Poulsen speeder went back upon this errand several hundred feet, picked up the rails, laid them on the front part of the speeder and started on its return toward Keasey at a speed variously stated at from six to ten miles. In the meantime, defendant Domnisse, who appears to have known little or nothing about the management of the speeder, started up his car, and at a point probably 150 or 200 feet from where it had made a stop he met the Inman-Poulsen speeder and the collision occurred. Domnisse testified that Davidson gave him a signal which he interpreted as a signal to come ahead with his car and that he did so, meeting the other car unexpectedly, he put on his brakes and stopped his car and that the Inman-Poulsen car collided with him and in this way he accounted for the collision. The testimony for the plaintiff is to the effect that when Winkler, the operator of Inman-Poulsen Lumber Company's car, saw the other car approaching at a rather rapid rate of speed he put on his brakes and came almost

to a stop before the collision occurred. Plaintiff testified that Davidson had gotten in the Inman-Poulsen speeder and was sitting by her side and called out to her to jump, and that she jumped from the car, breaking her ankle and receiving a very serious, if not a permanent injury. One of the main questions in the case is, Who, if anyone, was the negligent cause of the collision? The plaintiff's main contention is, of course, that Davidson, being in charge of the O. A. L. Company's speeder, was bound to operate it with at least reasonable regard for the safety of the occupants of the other car and that such reasonable operation would preclude his driving the car or causing it to be driven up the road where the Inman-Poulsen Lumber Company's car would likely to be on its way down toward Keasey. The plaintiff contends that Davidson gave the signal to Domnisse to bring the car along and in so doing acted negligently both in respect to causing the car to be driven at all and in causing it to be driven by an unskilled and ignorant driver. Davidson stoutly denies that he ever gave such an order or requested Domnisse to bring the car up the road, or to do anything with it except he states that when he went up to the Inman-Poulsen speeder to discuss picking up the rails, he told Domnisse to watch the car. The testimony in this respect is conflicting and if the writer had been on the jury he would have hesitated in accepting Domnisse's statement that Davidson signaled to him to proceed.

■■ It was merely a question of fact for the jury and there is some evidence to justify plaintiff's contention. Under the Constitution, we have no authority to pass upon the weight of the evidence, so, for the purpose of this case, we must assume

that the order was actually given and it was really not an unnatural order under the circumstances had Davidson left the speeder in charge of a competent man instead of one who seems to have been an ignoramus so far as knowledge of its operation was concerned. The situation was that the rails which Davidson desired to carry down to Keasey were beyond the point where the Inman-Poulsen speeder stopped and it would have been impossible to have gone past the Inman-Poulsen speeder in order to find the rails and put them upon the speeder controlled by Davidson, so it would seem the natural thing that the Inman-Poulsen speeder should be backed up to or beyond the place where the rails were in order that the O. A. L. Company's speeder could take them on board and it was natural, being ignorant of the exact place where the rails were, that Davidson should desire to be a little ahead in order to find them, and it would not be unusual for him to have wished to have his own speeder near the place where they were picked up, but this is merely speculation. So, we have here this undoubted and unquestionable state of affairs: The Inman-Poulsen speeder was moving down the track toward Keasey and the O. A. L. speeder was moving up the track toward the O. A. L. Company's camp and under these circumstances they collided. It is evident that the collision could not have occurred unless somebody was negligent. There was a serious blunder somewhere which resulted in an injury to the plaintiff. Now, whose blunder was it? Looking at the matter through the medium of the testimony, there is much to justify the idea that it was a case of joint negligence on the part of both parties, but, in that event, it would be no justification to the defendant com-

pany here to demonstrate that fact that the Inman-Poulsen Lumber Company was also negligent.

██ The plaintiff could elect to sue one of two or more joint wrongdoers if she saw fit. In fact, in this case there seems to be a general disposition among all the defendants as between Davidson and the O. A. L. Company to pass the responsibility on to somebody else rather than to show there was no negligence on the part of anybody. If we assume, as we must, under the verdict of the jury, that Davidson directed or requested Domnisse to follow him with the O. A. L. Company's speeder, which the jury had a right to find, it was a negligent act under the circumstances, and he was as much responsible as though he had been actually in control of the speeder himself. If anyone is legally responsible for plaintiff's injury, it is the company who placed Davidson in charge of the speeder with authority to operate it on their business on that road.

██ There is a contention that the Inman-Poulsen Lumber Company was only operating their speeder on the end of the road between the O. A. L. Company's camp and Keasey by sufferance and they themselves were licensees, but the testimony taken altogether indicates that both companies were engaged in the same class of business; that the necessity for both of them to use each other's tracks existed as to both, and that whatever agreement they may have had between themselves, they were to be treated as joint users of the tracks. The O. A. L. Company was not a trespasser or a bare licensee when it chose to use the portion of the track constructed by the Inman-Poulsen Lumber Company, nor was the Inman-Poulsen Lumber Company a bare licensee when it used the track of the O. A. L. Com-

pany in the course of its business, and in the situation in which the companies were placed, with no other ingress or egress to or from their respective camps except by the railroad track, the speeders constituted a necessary part of their equipment and a necessary adjunct to carrying on their business. They were at a remote place in the forest and neither would be able to keep or secure workmen or conveniently obtain provisions, or transact the incidental part of their business with the outside world, which was necessary to carry it on, without the use of the speeders or something of that character. They were used to bring their employees into their camps and to get them out, and bring them into their camps for the purpose of carrying on their business, necessarily correlated a corresponding obligation to take them out again on necessary occasions. They owed this as a moral if not a legal duty. The plaintiff went into the Inman-Poulsen Company's camp as an employee and labored there for several months and it was not expected, nor could it be reasonably anticipated that when her work ceased, she should walk seven or eight miles through the howling wilderness to get a passenger railroad which would carry her to civilization. She was not a bare licensee and when having gone into the camp on the business of the company she worked for, she was entitled to consideration in the manner of getting out. The testimony does not indicate that anybody so situated was ever refused transportation, or that they were in the habit of asking it as a favor, but rather that it was granted as a matter of course just as the same consideration was shown to people coming in to sell provisions and supplies to the companies. It is true that the railroad was not strictly a passenger

road in that it had no schedule or fees for the transportation of passengers, and was not permitted to carry passengers for hire thereby avoiding the supervision of the Public Utilities Commission; but, the fact that they charged no fare did not in any way lessen their responsibilities any more than it lessens the responsibility of a common carrier railroad to a passenger, who is traveling on a free pass, and the very fact that a common carrier carries a person free does not on that account lessen their liability for injuries sustained by reason of negligence.

██ Under all the facts in this case, we hold that both of these companies owed the plaintiff the duty of taking reasonable care that she should not be injured by their negligence while traveling over the tracks jointly used by them, and that there is evidence sufficient to go to the jury that both companies were negligent in that respect. The evidence shows that Davidson was in charge of the O. A. L. Company's speeder in the transaction of the company's business as an agent of the company, and for all the purposes connected with the use in the management of the speeder on this road he was the company; that for like purposes Winkler, who was put in charge by the Inman-Poulsen Lumber Company as an operator of their speeder, was also the company, and for the joint and several negligence both of their respective companies were liable.

The question is raised as to the effect of the verdict of the jury in respect to Domnisse upon the verdict in this case. The verdict is rather peculiar. The jury found in favor of the plaintiff and against the O. A. L. Company and Davidson, but as to Domnisse they returned a verdict in the following words:

"We the jury, duly impanelled to try the above entitled cause, find our verdict for the defendant S. J. Domnisse. Not Guilty.

"WILLIAM E. NEWMAN, Foreman."

■ It is contended that by finding Domnisee "not guilty" the jury found that he did not operate the car recklessly or unskilfully and that he did not know that it would collide with the speeder of the Inman-Poulsen Company. Technically considered, perhaps the jury may have found all these things, but Lord only knows what they intended by their verdict of "not guilty" as to Domnisse, but the verdict for him would not necessarily preclude the charges of negligence against the O. A. L. Company and Davidson.

■ The gist of the charge against Domnisse was that he operated his speeder at a too high rate of speed and also operated it in the direction of the Inman-Poulsen Lumber Company's speeder. There is no evidence that Domnisse knew what was going to be done with the Inman-Poulsen speeder or when it was likely to return. The evidence shows that Davidson did know where it was going and what was to be done and how soon it was to return. Domnisse might possibly not be negligent in the respects charged and still Davidson, and through him the company he represented, be guilty of the negligence charged against him and his company. It must be confessed that the proposition is a very close one, but courts are disposed to be rather tender and considerate of the inexperience and idiosyncrasies of jurors and not to seek mere technical reasons for setting aside their verdict.

It is to be regretted that the pressure of business of this court precludes a discussion in detail of the various points urged by defendants' counsel. We

have, however, given them serious consideration, although, for the reasons mentioned, we have not discussed them editorially in the opinion.

The judgment of the Circuit Court is affirmed.

AFFIRMED.

RAND, C. J., and COSHOW and ROSSMAN, JJ., concur.

---

Former opinion adhered to on rehearing November 27, 1928.

ON REHEARING.

(271 Pac. 986.)

For appellants there was a brief over the name of *Messrs. Wilson & Reilly*, with an oral argument by *Mr. James G. Wilson*.

For respondent there was a brief over the name of *Messrs. Senn & Recken*, with an oral argument by *Mr. F. S. Senn*.

COSHOW, J.—Defendants Oregon-American Lumber Company and Carl Davidson are the appellants. They have presented a very pungent petition for rehearing. Their petition does not raise any new question but is a direct attack on the conclusions and reasoning of the opinion heretofore filed herein: 266 Pac. 254. The alleged grounds for rehearing are presented under five points. Four points, however, diverge from the central contention expressed in this language: "There was no evidence sufficient to be submitted to the jury of any negligence on the part of the appellants." Appellants contend that defendant Domnisse was not directed to move the speeder belonging to appellant Oregon-American Lum-

ber Company under the immediate charge and control of defendant Carl Davidson, who was an agent and officer of defendant Oregon-American Lumber Company. From this statement appellants argue the four different reasons for which they request a rehearing. The rehearing was granted and the case reargued but no new authorities were presented. The case has been thoroughly considered again, discussed in conference and the court adheres to its former decision. The argument of appellants is based mainly upon questions of fact. Our Constitution prescribes:

"In actions at law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, *unless the court can affirmatively say there is no evidence to support the verdict.*" Art. VII, § 3c.

Appellants seem to recognize that there is some evidence, for they base their points for a rehearing not upon the language of the Constitution but upon this language: "There was *no evidence sufficient* to be submitted to the jury of any negligence on the part of appellants." This statement admits that there was some evidence. In the minds of the appellants it was not sufficient to be submitted to the jury. This matter was thoroughly considered, correctly decided and aptly stated in the former opinion. ▮▮▮ Some material evidence in behalf of plaintiff is as follows:

"Q. Mr. Domnisse, * * did you get any signal from Mr. Davidson to run back? A. Yes, I got a signal—what apparently was a signal by the hand—I got two of them."

On cross-examination Mr. Domnisse testified in part as follows:

"Q. Well, Mr. Domnisse, as I understand you, then you were not paying any attention to Mr. Davidson or the Inman-Poulsen speeder at the time— A. (Interrupting.) Not until this lady reminded me of it; then is when I looked up and say (saw) these signals.

"Q. * * How many signals, if any, did you see, given by Mr. Davidson, yourself? A. Two.

"Q. These two signals that you saw and which you say were given, how were they given—in what manner? A. Like this.

(Illustrating and indicating, by a movement of the right arm.)

"Q. The signal was given as you have shown to the jury by an upward movement of the arm? A. Yes, by an upward movement of the arm; he was standing this way (illustrating). He was down there and I was up here, and he brought his hand around like this."

The witness, who was one of the defendants, then illustrated to the jury just the nature of the signal given him by the defendant Davidson, the agent and officer of the defendant Oregon-American Lumber Company. Thus we have not only the testimony of Domnisse to the effect that he was signaled to advance but also his evidence that he did not observe the signals until a lady on the car with him directed his attention to it and the further evidence of the illustrations to the jury given by the defendant Domnisse. The jury in passing upon the question had something more than the mere testimony from the lips of Mr. Domnisse. The jury must have found that defendant Davidson actually signaled to Domnisse to bring the car on following the Inman-Poulsen speeder. This was substantial evidence. Plaintiff was not a trespasser. She was an invitee and the appellants as well as the other defendants owed her reasonable care to avoid doing her injury.

We think the other opinion sufficiently discusses the salient points in the case. The other matters raised in the petition for rehearing grow out of and depend upon the contention that there was no evidence of a material nature that Domnisse was directed by the appellants to move the speeder. Appellants argue that they cannot be liable unless Davidson consciously directed Domnisse to move the speeder as he did. We must determine what Davidson did from a description of what transpired at the time and place. The jury had this all before them, including Mr. Davidson's testimony. There was evidence that Davidson directed Domnisse to move the car. The jury was the judge of what Davidson intended to do by his gestures or signals. The jury has decided that question.

■ Appellants contend that there was no evidence that a clearance was given the Inman-Poulsen speeder by appellant Oregon-American Lumber Company. The pleadings practically admit that a clearance was given. The further and separate answer of defendant Oregon-American Lumber Company alleges:

"That the Inman-Poulsen Lumber Company is likewise engaged in the operation of a logging camp in the vicinity of the logging camp of this defendant, Oregon-American Lumber Company, in Clatsop County, Oregon, and has also constructed and operates a logging railroad from its camp to a connection with the logging railroad of the defendant, Oregon-American Lumber Company, and that by mutual agreement between the said Oregon-American Lumber Company and Inman-Poulsen Lumber Company, said Oregon-American Lumber Company has a right to operate its logging trains over the logging railroad of the Inman-Poulsen Lumber Company and the said Inman-Poulsen Lumber Company has a right to operate its logging trains over the logging

railroad of the Oregon-American Lumber Company, both of said rights are without charge and without unnecessary inconvenience to the owner of said line; that neither said Inman-Poulsen Lumber Company nor said Oregon-American Lumber Company is a common carrier of freight or passengers over said logging railroads and said logging railroads are maintained and operated solely for the use and benefit of said lumber companies, and for the purpose of enabling said companies to transport logs from their respective logging camps to their respective mills for the purpose of manufacturing same into lumber and for no other purpose.''

The evidence does show that that speeder stopped at the logging camp of the Oregon-American Lumber Company for that purpose. It also shows that the operator of that speeder came out and proceeded on towards Keasey after going into the office of the Oregon-American Lumber Company as aforesaid. The jury was justified in inferring from that as well as from the pleadings that the clearance was obtained. We cannot for a moment assume that the appellant Oregon-American Lumber Company would permit the Inman-Poulsen trains or speeders to pass down the track to Keasey where there was no siding or passing track without a clearance. To do so would be gross negligence. The Oregon-American Lumber Company itself pleads that this interchange of traffic was carried on regularly. The fact that the clearance was given is hardly denied, except as a flimsy technicality.

The use of the railroad belonging to the Oregon-American Lumber Company cannot be said to have been gratuitous. The excerpt from the appellant Oregon-American Lumber Company's answer clearly shows that it gave to the Inman-Poulsen Com-

pany the right to use its own track for the privilege of using the track of the Inman-Poulsen Company. There was a valuable consideration given to the Oregon-American Lumber Company for the use of its tracks by the Inman-Poulsen Lumber Company. The relation is very similar to an exchange of properties. In its argument on rehearing here appellant Oregon-American Lumber Company attempted to draw a distinction between the logging trains and the speeders. In that argument it was admitted that the companies exchanged the use of their several tracks. We do not think there is any merit in the contention that any other relation existed between the two companies with reference to speeders than that which obtained with reference to logging trains.

The evidence clearly shows that the employees of the companies used either the logging train or the speeder for transportation in and out of the logging camps. There was no other way for them to get to the logging camps or out to the city. Under these circumstances appellants are not relieved from liability because plaintiff paid no fare. In a very true sense it can be said that employees, including plaintiff, who is the wife of an employee, paid their fare by their services to the company. It was necessary for the company to provide a means for their employees to get in and out of the logging camps in order to have their services. Transportation, therefore, may be looked upon as a part of the payment for the services of the employees and the members of their families.

We deem it unnecessary to further discuss the questions raised by the petition for rehearing. They were all covered amply by the former opinion, which is adhered to.        FORMER OPINION ADHERED TO.